In the

# United States Court of Appeals
### For the Seventh Circuit

———————

No. 05-2130

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TROY S. BURTON,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04-CR-245—**J. P. Stadtmueller**, *Judge*.

———————

ARGUED FEBRUARY 15, 2006—DECIDED MARCH 20, 2006

———————

Before POSNER, ROVNER, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*.  Troy Burton appeals from his conviction for being a felon in possession of a gun. He argues that the gun was seized in violation of the Fourth Amendment and should therefore not have been used as evidence against him.

Three police officers on bicycles were watching a house from which, according to an informant, illegal drugs were being sold. They saw a car, driven by Burton, who was accompanied by a woman in the front passenger's seat, stop near the house with its motor running. A man named

Johnson came from the adjacent house and, standing in the street on the driver's side of the car, leaned through the driver's open window. After seeing two passing cars swerve to avoid hitting Johnson, the police approached the car on their bicycles. One of the police officers placed his bicycle in front of the car and the others placed their bikes on either side of the car. An officer asked Johnson why he was standing in the street and he replied that he was "just talking to friends," but when the officer asked him who the friends were he was unable to identify either Burton or Burton's passenger. The officer then asked Burton whether he had a driver's license on his person. Burton answered that he did not. An officer patted down Johnson, discovering a knife. When the officers noticed Burton, still inside the car, repeatedly reaching into one of his pockets, they ordered him out of the car, patted him down, and discovered a gun. They issued Johnson a ticket for impeding traffic. Wis. Stat. § 346.29(2).

It is a reasonable, in fact a compelling, inference that the police placed their bikes where they did in order to make sure that Burton didn't drive away before they satisfied themselves that there was no criminal activity afoot. By doing this they "seized" the car, though in a severely attenuated sense. Burton's car was stopped, albeit with its motor running, when the police approached, because he was talking (probably transacting) with Johnson. He could hardly have driven away with Johnson leaning into the window. Between the time the police moved Johnson away from the car to frisk him and the time they learned that Burton was not carrying a driver's license and was fussing in a suspicious manner with something in his pocket—a concatenation of suspicious circumstances that justified their ordering him out of the car and frisking him—only a few minutes elapsed. The net delay may

have been zero, since Burton's transaction with Johnson was not complete. Had the police kept their distance, Burton would have remained stopped until he finished striking the drug deal with Johnson and the latter went and fetched the drugs.

Contrary to popular belief, the Fourth Amendment does not require that a search be based on probable cause to believe that the search will yield contraband or evidence of crime. The amendment requires that *warrants* be based on probable cause, but forbids only unreasonable searches. What is unreasonable depends on circumstances, including how intrusive the search is—how costly, in other words, to the person searched. There is a big difference between police ransacking a house in a search for evidence and stopping a pedestrian and asking him whether he's seen a fleeing man in a Santa Claus costume. Even though "approaching a person on the street (or at work, or on a bus) to ask him a question causes him to stop for at least the time needed to hear the question and answer (or refuse to answer)," *United States v. Childs*, 277 F.3d 947, 950 (7th Cir. 2002) (en banc), the curtailment of the bystander's mobility, privacy, and peace of mind is so slight that neither probable cause nor reasonable suspicion is required to justify the police action. No suspicion at all is required in such a case, *id.*; *United States v. Broomfield*, 417 F.3d 654, 656 (7th Cir. 2005); *United States v. Hooper*, 935 F.2d 484, 489 (2d Cir. 1991), or is present if the person stopped really is a bystander—the police do not suspect the bystander of being the Santa Claus imposter. Cf. *Illinois v. Lidster*, 540 U.S. 419 (2004). The intermediate case is the *Terry* stop, that is, a stop and frisk; since people are averse to being frisked, the courts require reasonable suspicion, *Terry v. Ohio*, 392 U.S. 1 (1968), except in special circumstances, such as airport searches.

The principle that emerges from the cases is that the less protracted and intrusive a search is, the less suspicion the police need in order to be authorized by the Fourth Amendment to conduct it, and vice versa. As we explained years ago in *United States v. Chaivez*, 919 F.2d 1193, 1197-98 (7th Cir. 1990) (citations omitted),

> It is "common sense that if the Fourth Amendment is intended to strike a balance between the interest of the individual in being left alone by the police and the interest of the community in being free from the menace of crime, the less the interest of the individual is impaired the less the interest of the community need be impaired to justify the restraint." Consideration of the extent of intrusion abounds in modern Fourth Amendment doctrine. Stops that do not entail detention need not be justified by any suspicion. Searches incident to arrest may be justified by the reduced marginal intrusion of searching a defendant already in custody. The Court based *Terry* itself on the fact that a protective search is a "brief, though far from inconsiderable, intrusion upon the sanctity of the person." Recently the Court upheld automobile checkpoints where the police made stops without any individual suspicion, in part because of the minimal "intrusion resulting from the brief stop at the sobriety checkpoint." . . . The scale extends in both directions. If an intrusion is *greater* than a traditional arrest, probable cause is not enough.

> These cases describe a continuum in which the necessary degree of confidence increases with the degree of intrusion. A "stop" without limiting the suspect's freedom requires no suspicion; a brief detention calls for reasonable suspicion; an arrest requires probable cause; invasive techniques such as surgery

require more. What if the intrusion lies somewhere between *Terry* and arrest, neither a "brief, investigatory" stop nor a traditional arrest, where the defendant is handcuffed, trundled into a paddy wagon, carted to the station, fingerprinted, and held in a 12′ x 8′ cell? One answer would be to deny that there is a "between"—to insist that all encounters must be either *Terry* stops or arrests. Yet circumstances defy such simple categorization, and if a line must nonetheless be drawn it will be arbitrary, with nearly identical cases on opposite sides. Trying to force a continuous world into two categories is not only impossible but also unnecessary when the text of the Constitution calls for inquiry into "reasonableness". Why abandon the search for reasonableness when the intrusion falls between arrest and stop?

Pigeonholing is no boon for defendants: it has put considerable pressure on the limits of the *Terry* doctrine. Both the permissible reasons for a stop and search and the permissible scope of the intrusion have expanded beyond their original contours, in order to permit reasonable police action when probable cause is arguably lacking.

In the present case, no frisk of the defendant occurred until the police had grounds for reasonable suspicion based on the tip about the drug house (uncorroborated, yet deemed solid enough to justify assigning three police officers to watch the house), Johnson's emergence from the adjacent house (though even if he'd been coming from the suspected drug house itself, this would not by itself have justified the stop, *United States v. Johnson*, 170 F.3d 708, 716-17 (7th Cir. 1999)), his curious positioning of himself in the street, his not knowing his "friend" 's name, his possessing a knife, and the defendant's furtive gestures. A natural

inference was that Johnson was negotiating a sale to Burton of illegal drugs. The car was "seized," however, earlier, on the basis merely of the drug-house tip, Johnson's emergence from the adjacent house, and the position he assumed in the street. The government doesn't argue that the mounting suspicion of illegal activity had yet reached a point at which they could have ordered Burton out of his car so that they could frisk him. No matter. For it justified their taking the less intrusive step of keeping him from driving away while they checked out Johnson, since if Johnson was a criminal, Burton might well be one too. See *United States v. Clark*, 337 F.3d 1282, 1283-84, 1288 (11th Cir. 2000). That was a minimal stop, requiring only minimal suspicion; and that the police had.

AFFIRMED.

ROVNER, *Circuit Judge*, concurring in the judgment. After seeing two cars swerve to avoid striking Johnson as he leaned through the window of Burton's car, police officers had ample cause to effectuate at least a limited seizure of Johnson—if for no other reason than to get him out of the way of moving traffic. Having legitimate reason to seize Johnson, I believe the officers were also justified in temporarily detaining Burton and his passenger by surrounding his car. The officers were approaching three strangers on the street in the immediate vicinity of a house reputed to be the site of narcotics trafficking. They had reason to be concerned for their own safety as well as that of passing motorists and pedestrians. Stationing themselves on three sides of Burton's automobile—against which Johnson was leaning—was a reasonable means of asserting control

over the scene until such time as Johnson was cleared from the roadway and the officers were satisfied that neither he nor Burton nor his passenger posed a danger. In the moment or two that it legitimately took the officers to do this, it is possible that they acquired the information that independently justified the (further) detention of Burton—he was driving without a license. As the record stands, we do not know whether the questioning that produced that disclosure prolonged the initial seizure, nor do we know whether during that questioning the officers removed one or more of the bicycles that were blocking the path of Burton's car. Gaps in the record such as these are readily explainable: Burton did not make below the particular seizure argument that he is making on appeal, resulting in an evidentiary record that is not as well developed as it should be and depriving us of relevant factual findings by the magistrate and district judges. The government unwisely has not argued that Burton forfeited his argument; consequently, it waived the forfeiture. But that waiver does not fill in what is missing from the record, and because Burton is responsible for the omissions, it is reasonable to resolve any evidentiary ambiguities against him. Based on the record we have, it is reasonable to assume that the police officers initially detained Burton no longer than was necessary to deal with Johnson's obstruction of traffic and to provide for their own safety and that within that time period Burton disclosed his own traffic infraction. That is sufficient to resolve Burton's Fourth Amendment claim, and I would say no more about whether seizures that are unsupported by either probable cause or reasonable suspicion may nonetheless be sustained as reasonable based on their relative brevity and minimal degree of intrusiveness.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*